# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| STEPHEN COOK, Individually And On Behalf Of All Others Similarly Situated, | Case No. 1:19-cv-195 |
| Plaintiffs, | |
| vs. | **CLASS ACTION COMPLAINT** |
| THE OHIO NATIONAL LIFE INSURANCE COMPANY, OHIO NATIONAL LIFE ASSURANCE CORPORATION, OHIO NATIONAL EQUITIES, INC. and OHIO NATIONAL FINANCIAL SERVICES, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Stephen Cook, by and through his undersigned attorneys, brings this action on behalf of himself and all others similarly situated (the "Class," as defined below) against Defendants The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation, Ohio National Equities, Inc., and Ohio National Financial Services, Inc. (collectively "Defendants" or "Ohio National"). Plaintiff alleges the following on information and belief, except as to those allegations that pertain to himself, which he alleges on personal knowledge.

## NATURE OF THE ACTION

1. Defendants have breached their agreement with Plaintiff and the Class by refusing to honor their commitment to compensate Plaintiff and the Class for services rendered.

2. Defendants issue variable annuity policies with guaranteed income benefit riders

that entitle an owner to pay a lump sum amount to an insurance company in exchange for future payments above a certain minimum monthly amount.

3. The issuance of these policies involves four parties: (a) Ohio National (the issuer); (b) a broker-dealer (which has a "Selling Agreement" with Ohio National permitting it to sell policies); (c) a securities representative affiliated with the broker-dealer (who advises customers about the policies); and (d) customers (who purchase the policies).

4. To induce the sale of these policies, and to compensate those who promote, sell and service such policies, Ohio National agreed to pay commissions to broker-dealers and their affiliated securities representatives, including Plaintiff, until and unless the policies were surrendered or annuitized, or the Selling Agreement was terminated for cause. The commissions came from the payments customers made to Ohio National when the policies were purchased.

5. Having induced the sales of these policies based on the agreement to pay commissions to broker dealers and their affiliated securities representatives, Ohio National recently and unilaterally terminated the vast majority of its Selling Agreements, without cause, and stopped paying the promised commissions. While Ohio National has the right to stop future sales of its policies, it is contractually precluded from unilaterally terminating its obligation to pay commissions on existing already-sold policies for which Ohio National already collected amounts that will be used to satisfy such commissions.

6. In addition to breaching its agreement to compensate Plaintiff and the Class, Ohio National's decision to stop paying commissions on existing policies will not reduce the expenses for customers who bought such policies. That is because Ohio National has decided to simply keep those commissions itself, notwithstanding the fact that policy owners agreed to pay (and in

fact paid) Ohio National a certain sum when they purchased the policies with the understanding that such payments included compensation to the customer's trusted advisor who had advised and would continue to advise such customers on how to manage the policy.

7.      Plaintiff thus brings this action to address, prevent and/or remedy Defendants' wrongful conduct.

## THE PARTIES

8.      Plaintiff Stephen Cook is a resident of Dallas County, Texas. Plaintiff is a securities representative affiliated with Triad Advisors LLC, a broker-dealer that has signed a Selling Agreement with Ohio National to promote, sell, and service variable annuity policies with guaranteed income benefit riders issued by Ohio National.  The Ohio National/Triad Selling Agreement specifically contemplates and intends that securities representatives, such as Plaintiff Cook, will be used to sell and service Ohio National's products and will receive commissions for so doing that will be paid by Ohio National to Triad and forwarded to Plaintiff.  The Ohio National/Triad Selling Agreement also specifically imposes various duties and responsibilities upon securities representatives, including Plaintiff, that must be followed in selling Ohio National's products.  Plaintiff has promoted, sold, and serviced such Ohio National policies and received commissions in exchange for such services. Pursuant to the Selling Agreement between Ohio National and the broker-dealer with whom Plaintiff is affiliated, Ohio National has paid, and prospectively owes, Plaintiff and his affiliated broker-dealer commissions for the sale of such policies that are still in force and have not been surrendered or annuitized.

9.      Defendant The Ohio National Life Insurance Company is a corporation organized under the laws of Ohio with its principal place of business at One Financial Way, Cincinnati,

Ohio 45242. The Ohio National Life Insurance Company is a wholly-owned subsidiary of Ohio National Financial Services, Inc., which has the same principal place of business.

10. Defendant Ohio National Life Assurance Corporation is a corporation organized under the laws of Ohio with its principal place of business at One Financial Way, Cincinnati, Ohio 45242. Ohio National Life Assurance Corporation is a subsidiary of The Ohio National Life Insurance Company.

11. Defendant Ohio National Equities, Inc., is a corporation organized under the laws of Ohio with its principal place of business at One Financial Way, Cincinnati, Ohio 45242. Ohio National Equities, Inc. is an independent broker dealer registered with FINRA. Upon information and belief, Ohio National Equities, Inc. is a wholly-owned subsidiary of The Ohio National Life Insurance Company.

12. Defendant Ohio National Financial Services, Inc. is a corporation organized under the laws of Ohio, with a principal place of business at One Financial Way, Cincinnati, Ohio 45242. Ohio National Financial Services, Inc. is the sole parent of The Ohio National Life Insurance Company.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction based on diversity of citizenship. Additionally, because this Complaint alleges claims on behalf of a national Class of broker-dealers and securities representatives who are minimally diverse from Defendants, and because the aggregate of these claims exceed $5,000,000, this Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. §1332(d). Supplemental jurisdiction over Plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Defendants because each Defendant is incorporated in the State of Ohio, and their principle places of business are in Ohio. This Court also has personal jurisdiction over Defendants because they have purposely availed themselves of the privilege of conducting business activities in Ohio and because they currently maintain systematic and continuous business contacts with Ohio.

15. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants maintain business operations in this District; many thousands of Class Members either reside or did business with the Defendants in this District; Defendants engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and, the subject agreement elects Ohio law to govern all disputes arising from such agreements.

## FACTUAL ALLEGATIONS

**A.  GMIB Variable Annuity Policies**

16. A variable annuity is a contract or policy sold by an insurance company under which the owner deposits a lump sum amount of money with an insurance company in exchange for a promised annual payment of money by the insurance company to the policy owner. A variable annuity allows for the accumulation of capital on a tax-deferred basis. Unlike a fixed annuity that offers a guaranteed interest rate and a minimum payment at annuitization, variable annuities offer investors the opportunity to generate higher rates of returns by investing in securities. If a variable annuity is annuitized for income, the income payments can vary based on the performance of the underlying assets.

17. The insurance company uses the variable annuity policy owner's deposited funds

to purchase assets—often securities such as mutual funds, index funds, treasury notes, etc.—from a list of assets pre-selected by the insurance company. The insurance company then issues annual or semi-annual payments to the policy owner based on the performance of the underlying purchased assets. The performance of the assets determines the amount of the payments made by the insurance company to the owner of the variable annuity policy.

18. In a "guaranteed minimum income benefit," or "GMIB" annuity, the annuity contract entitles the policy owner to receive a certain minimum amount of money, regardless of market conditions or the performance of the underlying assets. Such GMIB variable annuity policies provide an amount of annual income derived by taking the higher of a fixed percentage of either the investor's account value or a fixed guaranteed minimum. Should a policy's account value to fall to zero—due to underperforming assets, contract fees and/or income distributions—the issuer of such a policy is nonetheless responsible for paying a certain level of guaranteed income during the life of the policy owner.

19. The sale of such policies by an insurance company is generally done through a broker-dealer, who contracts with the insurance company to promote and sell the policy, and ultimately by an individual securities representative affiliated with the broker-dealer who sells the policy and advises individual customers on how to manage the policy.

20. To induce the sale of such policies, and to compensate those who promote, sell and service such policies, the insurance company issuing the policies agrees to pay the broker-dealer a commission until and unless the policy is surrendered or annuitized. Both the insurance company and the broker-dealer, as reflected in the terms of the Selling Agreement itself, contemplate and intend that sales representatives working for the broker-dealer would be

utilized to sell the insurance company's products, and would be entitled to receive commissions for their efforts. Those commissions came from money paid by the customer to the issuing insurance company when the policy is purchased and are predicated on the promise made by the issuer that the customer who bought the policy would be able to rely on the customer's trusted advisor to help manage the policy.

**B.       Ohio National Issues GMIB Variable Annuity Policies**

21.     Ohio National sold variable annuity contracts with GMIB riders ("Policy" or "Policies") since at least 2012.

22.     Ohio National sold such Policies through many unrelated nationwide broker-dealers and affiliated securities representatives. To facilitate the sale of such Policies by unrelated broker-dealers and their affiliated securities representatives, Ohio National entered into Selling Agreements with such broker-dealers (collectively, "Selling Agreement" or the "Agreement").

23.     The Selling Agreement between Ohio National and broker-dealers provides that it "will be construed in accordance with the laws of the State of Ohio."

24.     The Selling Agreement provides that the broker-dealers would cause securities representatives—such as Plaintiff—to market, sell and service the Policies.

25.     The Selling Agreement also requires the broker-dealer to train, direct, and supervise the conduct of its securities representatives, and also to warrant that such representatives meet certain guidelines. One of the purposes of the Selling Agreement is to impose various duties and responsibilities on the broker-dealer and the securities representatives regarding the sale of Ohio National's products, a purpose that is reflected in the preamble to the

Selling Agreement:

      a.     "Whereas, [Ohio National entities] propose to have [broker-dealer's] registered representatives ("Representatives") who are, or will become, duly licensed insurance agents, solicit sales of the Contracts; and

      b.     Whereas, [Ohio National] delegates to [broker-dealer], to the extent legally permitted, training and certain administrative responsibilities and duties in connection with sales of the Contracts. . . ."

      26.     In exchange for these services to be done by the broker-dealer, the Selling Agreement provides that Ohio National would pay the broker-dealer and its affiliated securities representatives commissions for the sale of these Policies based on the Commission Schedule "in effect at the time that the Contract Payments are received" by Ohio National. Section 9 of the Selling Agreement, entitled "Commissions Payable", states in its entirety as follows:

> "Commissions payable in connection with the Contracts shall be paid to [broker-dealer] or its affiliated insurance agency, according to the Commissions Schedule(s) relating to this Agreement as they may be amended from time to time and in effect at the time the Contract Payments are received by [Ohio National]. [Ohio National] reserves the right to: revise the Commission Schedules at any time upon at least thirty (3) days prior written notice to [broker-dealer]. [Ohio National] also reserves the right to adjust the compensation payable on sales of [Ohio National] products that replace existing [Ohio National] contracts and offset future compensation payable to [broker-dealer] against any compensation to be returned to [Ohio National] by [broker-dealer]. Compensation to the [broker-dealer's] Representatives for Contracts solicited by the Representatives and issued by [Ohio National] will be governed by an agreement between the [broker-dealers] and its Representatives and its payment will be the [broker-dealer's] responsibility. In those states where express assignment of commissions is required, [broker-dealer] hereby assigns its Representatives' commissions to its affiliated insurance agency for those states.
>
> [Broker-Dealer] will not pay any compensation to a Representative licensed pursuant to this Agreement until such Representative is authorized to receive such compensation under applicable state law.
>
> The terms of compensation shall survive this Agreement unless the Agreement is terminated for cause by [Ohio National], provided that [broker-dealer] in good standing with the [FINRA] and other state and federal regulatory agencies and that [broker-dealer] remains the broker-dealer of record for the account."

27. The Selling Agreement and Commission Schedule(s) referenced therein identifies three types of commissions payable: (1) commissions on initial premiums; (2) commissions on add-on premiums; and, (3) trail commissions. This action concerns trail commissions, which is compensation based on both the premiums paid by the Policy owner and the earnings on those premiums that is deferred by the broker-dealer for at least a year, and that lasts until the Policy is annuitized or surrendered. More specifically, the Commission Schedule allows a broker-dealer and/or its affiliated securities representative to choose to be paid a greater amount upon the initial sale of the Policy, or to be paid more evenly (in the form of a trail commission) over the life of the Policy.

28. According to the referenced Commission Schedule(s), trail commissions would be paid to Plaintiff and the Class Members not only during the life of the Selling Agreement, but with respect to each Policy so long as the Policy remained live. According to the Commission Schedule:

> "Trail commissions will continue to be paid to broker dealer of record while the Selling Agreement remains in force and will be paid on a particular contract until the contract is surrendered or annuitized.
>
> We reserve the right to adjust commissions on policies annuitized during the first contract year."

29. Accordingly, the Selling Agreement: (1) requires that Ohio National pay commissions at the time the annuity is sold and Ohio National receives the Policy owner's lump sum payment; (2) expressly contemplates that those commissions paid to the broker-dealer pursuant to sales of Policies would be passed on (partially or completely) to the securities representatives themselves; and, (3) such commissions would continue to be paid unless and

until the Policy is surrendered or annuitized.

30. Finally, Ohio National has not terminated the Selling Agreement "for cause," nor does Ohio National have any basis for terminating the Selling Agreement "for cause."

**C.     Broker-Dealers & Securities Representatives are Intended Beneficiaries**

31. Broker-Dealers are the signatories to the Selling Agreements and are explicitly entitled to compensation arising from their promotion, sale and servicing of such Ohio National Policies.

32. The Selling Agreement also provides that securities representatives are the intended beneficiaries of the contract. Ohio law incorporates Section 302 of the Second Restatement of Contracts with regard to intended beneficiaries under a contract. Section 302 states in part:

> "Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either: (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

33. Thus, if the promisee intends that a third party should benefit from the contract, then that third party is an intended beneficiary who has enforceable rights under the contract. Because the Selling Agreement provides that broker-dealers will delegate the sale of the Policies to such "Representatives," commissions paid by Ohio National to broker-dealers will thus pass through to these securities representatives according to a separate agreement between the broker-dealer and the securities representative. The contemplation of such passthrough commissions (including trail commissions) make Plaintiff and other Class Members third-party

beneficiaries under the Selling Agreement.

34. The Selling Agreement also contains provisions demonstrating that Ohio National and the broker-dealer intended that individual securities representatives, including Plaintiff, would have various duties and responsibilities regarding the sale of Ohio National's products. These duties and responsibilities further demonstrate that the Selling Agreement was intended to affect individual securities representatives. For instance, Ohio National and the broker-dealer intended that securities representatives would be qualified and registered to sell Ohio National's products under both federal and state laws applicable to the location of the sale (Section 5), and that securities representatives would only use sales and promotional material for Ohio National's products that have been approved by Ohio National (Sections 5 and 6).

35. By the explicit terms of the Selling Agreement, Ohio National precludes individual securities representatives from receiving commissions from the broker-dealer if the terms of the Selling Agreement are not met by the securities representatives. For instance, broker-dealers cannot pay commissions to a securities representative "until such Representative is authorized to receive such compensation under applicable sate law." (Section 9.)

**D. Defendants Announce The Termination of Trailing Commissions**

36. In or around 2018, Ohio National concluded that the issuance of its Policies was unprofitable.

37. In September 2018, Ohio National issued a letter to nearly all broker-dealers with which it had a Selling Agreement announcing that it was cancelling those agreements (effective December 12, 2018) and no longer paying trailing commissions, even on existing, valid Policies. According to the letter:

To Whom It May Concern:

This letter is to provide notice of termination of any and all selling agreements, as amended, by and between you and any of your affiliates and The Ohio National Life Insurance Company, Ohio National Life Assurance Corporation and Ohio National Equities, Inc. Termination will be effective December 12, 2018. Pursuant to the agreement, all individual annuity trail compensation will cease at that time. All group variable annuity trail compensation and life insurance renewal commissions will continue to be paid per the terms of the selling agreement.

You will receiving information shortly about the terms for servicing your clients after termination of the selling agreement(s).

If you have any questions, please direct them to legal@ohionational.com.

Sincerely,

William C. Price
Senior Vice President & Assistant General Counsel

38.     The letter provided no basis, justification or explanation for the termination.

39.     In stating that Ohio National will stop paying commissions as of December 12, 2018 on existing Policies, Defendants have breached the Selling Agreement and are unlawfully retaining millions of dollars that rightfully belong to Plaintiff and the Class in the form of unpaid commissions.

40.     By stopping payment of commissions, Defendants have caused damage and irreparable harm to Plaintiff in the form of lost revenue. Plaintiff sold Ohio National individual annuity products for which trail commissions were being paid prior to Ohio National's unilateral termination of the Selling Agreement and decision to end payment of individual annuity trail commissions. On information and belief, these same damages have been suffered by the members of the Class, as defined below.

## CLASS ACTION ALLEGATIONS

41. This action is brought by Plaintiffs individually and on behalf of the class described below (the "Class") pursuant to Rule 23, subdivisions (a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

42. Plaintiffs seek certification of the following Class:

All securities representatives who: (1) sold an individual variable annuity with a guaranteed minimum income benefit rider pursuant to any and all Selling Agreements by and between Defendants and broker-dealers, provided that such annuity had not been surrendered or annuitized by December 12, 2018; (2) received commission compensation from such sale in the form of trail commissions; and (3) ceased receiving such trail commissions pursuant to Defendants' 2018 unilateral decision to terminate the Selling Agreements.

43. Excluded from the definition of the Class are Defendants, and their affiliates, subsidiaries, agents, board members, directors, officers and/or employees, including Defendants' captive broker-dealer's securities representatives. Also excluded from the Class are Morgan Stanley Smith Barney LLC and its affiliated securities representatives.

44. There are thousands of members of the Class such that joinder of all members is impracticable. The identities and addresses of the members of the Class can be readily ascertained from business records maintained by Defendants.

45. The claims asserted by Plaintiff are typical of the claims of the Class Members.

46. Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the interests of the Class and has no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Class.

47. The self-interests of Plaintiff are co-extensive with and not antagonistic to those

of absent Class Members. Plaintiff will undertake to represent and protect the interests of absent Class Members.

48. Plaintiff has engaged the services of counsel indicated below who are experienced in complex class litigation and insurance matters, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and absent Class Members.

49. This action is appropriate as a class action pursuant to Rule 23 (b)(2). Plaintiff seeks injunctive relief and corresponding declaratory relief for the Class. Defendants have acted in a manner generally applicable to each member of the entire Class by cutting off the commission on all Policies sold by Class Members.

50. Defendants' wrongful actions in unlawfully cutting off the commissions to the Class, if not enjoined, will subject Plaintiff and Class Members to enormous continuing future harm and will cause irreparable injuries to such Policy owners, who are forced to monitor their Policies without the benefit of their trusted advisor. The adverse financial impact of Defendants' unlawful actions is continuing and, unless preliminarily and permanently enjoined, will continue to irreparably injure Plaintiff and the Class Members.

51. This action also is appropriate as a class action pursuant to Rule 23 (b)(3) of the Federal Rules of Civil Procedure.

52. Common questions of law and fact predominate over any individualized questions. Common legal and factual questions include the following:

    a. Whether Defendants' actions in suddenly cutting off commissions is authorized under the terms of the selling agreements;

    b. Whether Defendants breached their contractual obligations owing to

Plaintiff and Class Members;

   c. Whether Defendants breached its implied duty of good faith and fair dealing owed to Plaintiff and the Class Members;

   d. Whether Defendants engaged in unfair or unlawful business practices in its dealings with Plaintiff and the Class Members;

   e. Whether Plaintiff and the Class Members have been damaged, and if so, are eligible for and entitled to compensatory and punitive damages;

   f. Whether Plaintiff and the Class Members are entitled to declaratory relief; and

   g. Whether Plaintiff and the Class Members are entitled to preliminary and permanent injunctive relief, or other equitable relief, against Defendants.

  53. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for at least the following reasons:

   a. Once Defendants' liability has been adjudicated respecting the termination of commissions, the claims of all Class Members can be determined by the Court;

   b. This action will insure an orderly and expeditious administration of the Class claims and foster economies of time, effort and expense, and ensure uniformity of decisions and compliance by Defendants with the selling agreements;

   c. Without a class action, many Class Members would continue to suffer injury, and Defendants' violations of law will continue without redress while Defendants continue to reap and retain the substantial proceeds and reductions in its future liabilities derived from its wrongful conduct; and

d. This action does not present any undue difficulties that would impede its management by the Court as a class action.

54. A class action is thus superior to other available means for the fair and efficient adjudication of this controversy. The injuries suffered by individual Class members are, while important to them, relatively small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## **COUNT ONE**
(*Breach of Contract*)

55. Plaintiff refers to the prior paragraphs of this Complaint and incorporates those paragraphs as though set forth in full in this cause of action.

56. The Selling Agreement is a valid and enforceable contract between Defendants on the one hand and Plaintiff and the Class on the other hand.

57. Plaintiff and the Class, as securities representatives affiliated with broker-dealers, are intended third-party beneficiaries of the Selling Agreements that Ohio National has with the various broker-dealers regarding payment of commissions relating to the sale of Ohio National's products.

58. At all relevant times, Plaintiff and the Class promoted, sold and serviced Policies pursuant to the Selling Agreement and have otherwise performed all their obligations under the

Selling Agreement.

59. As alleged above, Defendants owes duties and obligations to Plaintiff and the Class under the Selling Agreement, including, but not limited to, compensating Plaintiff and the Class as authorized by the Selling Agreement and the referenced Commission Schedule(s).

60. Defendants have materially breached the terms and provisions of the Selling Agreement by, among others, terminating the Selling Agreement and the payment of commissions pursuant to the Selling Agreement and the referenced Commission Schedule(s).

61. Defendants' conduct and material breaches of the Selling Agreement have proximately caused damages to Plaintiff and the Class in an amount to be determined at trial. Such damages include, without limitation, the harm to and the diminution in value of the Plaintiffs' businesses.

62. In addition, unless Defendants are preliminarily and permanently enjoined from effectuating the termination of the Selling Agreements and withhold commission payments, among other things, Plaintiff and the Class will suffer severe and irreparable injuries for which they have no adequate remedy at law.

## COUNT TWO
(*Unjust Enrichment*)

63. Plaintiff refers to the prior paragraphs of this Complaint and incorporates those paragraphs as though set forth in full in this cause of action, except those paragraphs in connection with a breach of contract. This count is plead in the alternative to any breach of contract claim.

64. By promoting, selling and servicing the subject Policies issued by Ohio National,

Plaintiff and the Class conferred a benefit on Defendants, namely the proceeds from such sales, a portion of which Defendants agreed to give to Plaintiff and the Class as compensation for their efforts.

65. By retaining those commissions and not passing them off to Plaintiff and the Class, Defendants have and will continue to retain the benefits of their unlawful conduct.

66. Defendants' retention of such commissions would be unjust and inequitable because they are the result of efforts expended by Plaintiff and the Class which Defendants seek to retain for themselves.

67. Plaintiff and the Class Members may not have an adequate remedy at law and plead this count for unjust enrichment in the alternative to other claims pleaded herein.

## **COUNT THREE**
(*Declaratory Judgment, 28 U.S.C. § 2201*)

68. Plaintiff refers to the prior paragraphs of this Complaint and incorporates those paragraphs as though set forth in full in this cause of action.

69. An actual controversy exists between the Class and Defendants concerning Defendants' obligation to pay commissions pursuant to the Selling Agreement. Defendants have stated that they are terminating those Selling Agreements and will no longer pay the commissions as set forth in the referenced Commission Schedule(s).

70. Plaintiff and the Class are entitled to a judicial determination as to whether Ohio National is obligated to pay Plaintiff and the Class commissions for all active Policies subject to the Selling Agreement and the referenced Commission Schedule(s).

71. Such a judicial determination, detailing the rights and responsibilities of the

parties with regard to the payment and receipt of commissions pursuant to the Selling Agreement and the referenced Commission Schedule(s) is necessary and appropriate.

## JURY TRIAL DEMAND

72. Plaintiff requests a trial by jury.

## PRAYER FOR RELIEF

73. WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief as follows as applicable for the particular count:

    a. Declaring this action to be a proper class action maintainable to Rule 23(a) and Rule 23(b)(2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and his counsel to be representative of the Class;

    b. Declaring that Defendants breached the subject agreement and that Plaintiff and the Class are entitled to restitution and/or damages;

    c. An order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants;

    d. An order creating a constructive trust from which the Plaintiff and the Class may seek restitution or compensation;

    e. Awarding damages sustained by Plaintiff and the Class as a result of Defendants' conduct, together with pre-judgment interest;

    f. Awarding Plaintiff and the Class their respective costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

    g. Awarding Plaintiff and the Class their damages, injunctive relief,

declaratory relief, attorney's fees, and costs; and,

      h.    Awarding such other and further relief the Court deems just and equitable.

Dated: March 11, 2019

Respectfully submitted,

<u>s/ James B. Helmer, Jr.</u>
James B. Helmer, Jr. (0002878)
Robert M. Rice (0061803)
Jennifer L. Lambert (0075762)
B. Nathaniel Garrett (0090939)
HELMER, MARTINS, RICE &
  POPHAM CO., L.P.A.
600 Vine Street, Suite 2704
Cincinnati, Ohio 45202
Telephone: (513) 421-2400
Facsimile: (513) 421-7902
Email: jhelmer@fcalawfirm.com
rrice@fcalawfirm.com
jlambert@fcalawfirm.com
ngarrett@fcalawfirm.com

**Trial Attorney and Counsel for Plaintiff and the Class**

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
10 Bond Street, Suite 212
Great Neck, New York 11021
Tel.: 516-699-8890
Fax: 516-699-8968
E-mail: ronen@sarrafgentile.com
joseph@sarrafgentile.com

**Counsel for Plaintiff and the Class**